# EXHIBIT "A"

### SUMMONS

Attorney(s) __William P. Rubley, Cooper Levenson, P.A.__

Office Address __1415 Marlton Pike East, Suite 205__

Town, State, Zip Code __Cherry Hill, NJ 08034__

_____

Telephone Number __(856) 857-5550__

Attorney(s) for Plaintiff __Comtec Systems, Inc.__

Comtec Systems, Inc.
_____

_____

     Plaintiff(s)

    vs.

Farnam Street Financial Inc.
_____

Mike Louwerse
_____

    Defendant(s)

## Superior Court of New Jersey

__Cumberland__ County

__Law__ Division

Docket No: __CUM-L-695-21__

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

    If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

    If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

                                /s/ Michelle M. Smith
                                  Clerk of the Superior Court

DATED: __10/13/3921__

Name of Defendant to Be Served: __Farnam Street Financial Inc., c/o President/Managing Agent/General Agent__

Address of Defendant to Be Served: __3033 Excelsior Blvd. #340, Minneapolis, MN 55416__

**SUMMONS**

Attorney(s)  William P. Rubley, Cooper Levenson, P.A.

Office Address  1415 Marlton Pike East, Suite 205

Town, State, Zip Code  Cherry Hill, NJ 08034

Telephone Number  (856) 857-5550

Attorney(s) for Plaintiff  Comtec Systems, Inc.

Comtec Systems, Inc.

Plaintiff(s)

vs.

Farnam Street Financial Inc.

Mike Louwerse

Defendant(s)

# Superior Court of New Jersey

Cumberland    County

Law    Division

Docket No: CUM-L-695-21

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey.  The complaint attached to this summons states the basis for this lawsuit.  If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it.  (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.)  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ  08625-0971.  A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed.  You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above.  A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit.  If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529).  If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

/s/ Michelle M. Smith

Clerk of the Superior Court

DATED:  10/13/3921

Name of Defendant to Be Served:  Mike Louwerse

Address of Defendant to Be Served:  3033 Excelsior Blvd. #340, Minneapolis, MN 55416

William P. Rubley, Esq. (019192002)
Eric A. Browndorf, Esq. (002591983)
Cooper Levenson, P.A.
1415 Marlton Pike (Route 70) East
Cherry Hill Plaza – Suite 205
Cherry Hill, NJ 08034
Telephone: (856) 795-9110
Facsimile: (856) 795-8641
File No. 63465-00001
Attorneys for Comtec Systems, Inc.

| | |
|---|---|
| COMTEC SYSTEMS, INC.<br><br>Plaintiff,<br><br>vs.<br><br>FARNAM STREET FINANCIAL INC, MIKE LOUWERSE, JOHN DOES 1-10, and JANE DOES 1-10<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>CUMBERLAND COUNTY<br><br>DOCKET NO.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Comtec Systems, Inc., by way of complaint against Defendants, Farnam Street Capital, Mike Louwerse, and unknown John Does 1-10 and unknown Jane Does 1-10, avers as follows:

## PARTIES

1.      Comtec Systems, Inc. ("Comtec") is a New Jersey corporation with a principal place of business located at 2658 N. West Boulevard, in Vineland, New Jersey.

2.      Comtec is a small family-owned South Jersey company that has been in business since 1988.  Principally, Comtec delivers and installs phone and other communications systems to customers all over the United States, but primarily on the East Coast, from Maryland up through New England.  It has no presence in the State of Minnesota.  It has no offices, employees, customers, or salespeople in the State of Minnesota.

1

3.      In 2017 Comtec worked with an outsourced executive placement firm called TechCXO.  TechCXO provides temporary executives to small and fast growing businesses. In 2017 it placed John Delta with Comtec as a temporary Chief Financial Officer, which Comtec needed to help identify funding sources to meet its business model.

4.      John Delta referred Comtec to Defendant, Farnam Street Financial Inc. ("Farnam") located at 3033 Excelsior Blvd. #340, Minneapolis, Minnesota, 55416.

5.      Mike Louwerse ("Louwerse"), was and is employed as a Regional Director for Farnam located at 3033 Excelsior Blvd., #340, Minneapolis, Minnesota 55416.

6.      John Does 1-10 and Jane Does 1-10 are unknown partners, investors, and individuals who conspired with or worked in conjunction with Farnam and Louwerse to commit the unconscionable business practices detailed in this complaint.

### FACTS COMMON TO ALL COUNTS

7.      Farnam holds itself out as specializing "in designing customized lease financing solutions for companies acquiring technology and business essential assets."  See https://www.farnamstreet.net/#home .  Its website, www.farnamstreet.net, further states:

> Understanding the value of relationships.
>
> We made it our business to offer a flexible, customized leasing solution through a hands-on approach.  Farnam Street understands the value of establishing long-term relationships.  Our sales team is setup geographically so we can meet with you face-to-face to share our business model and listen to your unique challenges and needs.

8.      After discussing the possibility of funding, Comtec requested that Farnam send a representative to its facility so that Comtec could explain its business model and so that Farnam could better understand Comtec's goals and objectives. Farnam sent Defendant, Mike Louwerse, a Regional Director with Farnam.

2

9.      Comtec was completely transparent with Louwerse and explained that it needed funding to purchase hardware upfront to provide to its clients as a service and the cost of this equipment was to be amortized over thirty six (36) months. Anything longer than thirty six (36) months would be a nonstarter for Comtec and break its business model. Most of the hardware Comtec buys is end-of-life in thirty six (36) months so any financing extending beyond thirty six (36) months would be fatuous.

10.     During this initial meeting Louwerse offered additional funding in the form of soft-cost funding. Louwerse described it as anything Comtec wanted to purchase outside of "Hardware" they could provide as additional funding. This funding was to be all items that would have no residual value such as one time software purchases, sub-contracting other vendors, activation software fees, catch up support fees, multi-year up front warranties, shipping, taxes, and one time software purchase.

11.     Farnam provided two lease rates and separated both types of purchases on each schedule. Louwerse described the difference as: first, hardware that the leasing company could depreciate; and second, non-hardware which was at a significantly higher rate factor for which had no depreciation and had no residual value.

12.     Comtec proceeded to sign a Master Lease ("Lease Agreement"), attached as **Exhibit A**, with Farnam based on these assurances from Louwerse and the recommendation of TechCXO, John Delta.

13.     The Lease Agreement served as the master agreement and individual Schedules together with Certificates would follow that identified specific equipment - by serial number - and the other soft costs.  Throughout its relationship with Furnam, Comtec filled and delivered to Farnam seven (7) schedules (collectively referred to as

"Schedules" and individually identified by their schedule numbers of "Schedule 1" through "Schedule 7"), which are attached as **Exhibit B**.

14.     Comtec's largest concern was how Farnam would assess the "fair market value" of the hardware side of the equipment lease at the end of the term of each Schedule. Comtec discussed this issue with Louwerse after Schedule 1 was complete in early 2018 and told Louwerse this hardware would be basically worthless.

15.     Initially, Louwerse led Comtec to believe that not only did Farnam use industry standards to establish the value at the end, that it is also "the most competitive leasing company in the industry" so Comtec will be treated fairly. As the relationship grew with Farnam, Comtec felt that Farnam was highly aggressive in manipulating ways to create more "schedules of funding" which increased Comtec's liabilities.

16.     Knowing that Comtec had never completed a single schedule as of 2019 for the full three (3) years and had no proof that Farnam would uphold their representations to provide a cost effective buy-out and the end of the lease term, Comtec addressed this with Louwerse at the end of Schedule 7. Comtec halted all future Schedules until it received assurances from Farnam. Comtec elected to put a hold on accepting additional schedules until it had a defined buy-out for the upcoming expirations starting with Schedule 1.

17.     Comtec put Farnam on notice many months in advance of its intent not to auto renew the Lease Agreement and the Schedules.

18.     After reviewing the Lease Agreement with Farnam, Comtec discovered that many of the terms of the Lease Agreement were so oppressive that Comtec was essentially locked into making lease payments in perpetuity.

19.    Comtec learned that in order to terminate the Lease Agreement, or to terminate the individual Schedules after the initial lease term of three (3) years, Comtec was required to return all of the equipment within (10) days with matching serial numbers, to a place designated by Farnam.

20.    If even one piece of equipment was not returned exactly in the condition it was delivered and with matching serial numbers, then Farnam would reject the entire return and the Lease Agreement would renew automatically for another year.

21.    As the equipment was delivered and installed at Comtec's clients' places of business and only had a shelf life of approximately three (3) years it would be next to impossible for Comtec to return all of the equipment in pristine condition within the ten-day time period set by Farnam. Louwerse knew of these issues prior to the execution of the Lease Agreement.

22.    The Lease Agreement states:

> **7.    RETURN TO LESSOR:**  On the day following the last day of the lease term associated with a Lease Schedule (the "Return Date"), Lessee shall cause and pay for all the Equipment (by serial number where serialized) on that Lease Schedule to be deinstalled, packed using the manufacturer's original packing materials and shipped to the location(s) designated in writing by Lessor (the "Return Location").   If all the Equipment on the applicable Lease Schedule is not at the Return Location within ten (10) days of the Return Date, or Lessee fails to deinstall and ship all the Equipment on the Return Date, then any written notice of termination delivered by Lessee shall become void, and the Lease Schedule shall continue in accordance with this Lease Agreement. Irrespective of any other provision hereof, Lessee will bear

OR EQUIVALENT

> the risk of damage from fire, the elements or otherwise until delivery of the Equipment to the Return Location.  At such time as the Equipment is delivered to the Lessor at the Return Location, the Equipment will be at the risk of Lessor. In the case of Equipment that is software or related implementation services, Lessee will erase, delete and destroy all electronic incidents of software, and deliver to Lessor all tangible items constituting software. At Lessor's request, Lessee will also certify in a written form acceptable to Lessor that: (i) all tangible Software has been delivered to Lessor; (ii) all intangible records have been destroyed; (iii) Lessee has not retained the software in any form; (iv) Lessee will not use the Software after the termination date of a Lease Schedule; and (v) Lessee has not received from the software supplier(s) anything of value relating to or in exchange for Lessee's use, rental or possession of the software during the duration of the applicable Lease Schedule (including a trade-in, substitution or upgrade allowance).

See Exhibit A.

23.     Since it was impossible for Comtec to comply with the termination provision of the Lease Agreement, the Lease Agreement would automatically renew for another year, and then another in perpetuity.

24.     In addition, Farnam through Louwerse committed other unconscionable business practices in its relationship with Comtec.  Each of the unconscionable business practices as orchestrated by Louwerse and Farnam are described in detail below.

**The "Fair Market Value" Scam**

25.     Early on in a meeting with Louwerse in 2017 Louwerse indicated both verbally, through literature, and through their website, that Farnam specialized in small to growing midsize firms that needed leasing and financial services.

26.     Louwerse pressed Comtec to sign the Lease Agreement with Farnam because as they posted on their web site "guaranteed to get the lowest cost, highest value leasing solutions to our customers." Comtec took them at their word from the beginning that the program was designed around financial services and was commensurate with traditional finance leases.

27.     Though Comtec asked up front and throughout our relationship for a firm fixed anticipated cost of the buyout at the end of the term it was told by Louwerse that "financial

6

regulations" prevented Farnam from telling us the fair market value buyout cost prior to the expiration of the lease term. This statement was not true.

28.     However, Louwerse repeatedly acknowledged to Comtec that there was basically "very little" value to technology equipment at the end of the lease and Farnam's business model is to "get the depreciation." This statement was not true.

29.     Farnam did not recognize any form of fair market value analysis and specifically told Comtec at the end of Lease Schedule 1 that this was more like a "loan," and it does not assess fair market value by usual business methodology but rather it calculates the "fair market value" for overall buyout arbitrarily and through negotiations with the customer.

30.     Farnam's process of arbitrarily determining fair market value is evident through all emails exchanged at the end of schedule #1 (attached as **Exhibit C**). Farnam started with a 60% residual factor and ended up at 40%.  Farnam actually assessed a general rate of 40% fair market value to items that could under no circumstance have any sort of fair market value.

31.     For example, in Schedule 2 Certificate 10 (attached as **Exhibit D**) Comtec subcontracted Enghouse for subcontractor work (purely labor). Farnam paid specifically a labor-only item to an outside contractor which can have no residual value after three years of paying a service rate of 13%. However, Farnam assessed the fair market residual value to be 40% at the end of the payment schedule. To be clear, Farnam was assessing a residual fair market value of 40% to labor that was performed three (3) years earlier.

32.     Obviously, Comtec was not "leasing" labor.  This was effectively a loan that, together with all rental payments, servicing costs, and the buyout, would result in an effective interest rate in excess of 60%.

33.    Beyond equipment services and software, Farnam would regularly pay for software enhancements, upgrades to firmware, shipping, taxes, and other items that could not possibly have a residual value under any definition of a fair market value lease. The arbitrary assessment of what the services were actually worth had nothing to do with any real fair market value analysis. Louwerse and Farnam had deceived Comtec from the very beginning.

**Farnam Misrepresented "Buyout" Values In Order To Induce Comtec To Enter Into More Schedules**

34.    On February 19, 2021 Comtec reached out to Louwerse to review the fair market value and residual values for the termination of Schedule 1 and to discuss a buyout of Schedule 1.

35.    During that call, Comtec and Louwerse discussed the email that Mike Louwerse sent on perpetuating the Lease Agreement, Schedule 1, for another two years at "40% discount plus a buyout" - essentially 60% of the full lease payments. See email dated March 8, 2021 attached as **Exhibit E**. Louwerse said the reason it is higher is because Comtec stopped adding additional schedules and that if Comtec would agree to add more schedules and borrow more money he would agree to be more competitive with the "fair market value" rates.

36.    Even with this absurd offer, Louwerese misrepresented to Comtec by saying though he could not provide Comtec the exact buyout at the end of the new term for Schedule 1, he promised it "would be more favorable."

37.    Comtec was left with very few options: (1) either borrow more money from Farnam; or (2) face the consequences of paying inflated lease rates for two more years; or (3) pay an excessive one-time buyout charge.

38.    Comtec refused to be extorted into additional funding or be handcuffed into two (2) more years of lease payments.  Comtec settled on a one-time payment of $99,984.53 or 40%

of original lease, which was far in excess of fair market residual value of the equipment.  Comtec

had no choice as Louwerse said Farnam would put Comtec in immediate default if it did not pay

within ten (10) days.  This default would have crippled Comtec's ability to get additional

financing because it would hurt its position with alternate lenders. The total combined payout for

just Schedule 1 was approximately $37,000 in interim rent, plus approximately $288,000 in lease

payments, plus the $99,984.53 "buy out" totaling approximately $425,000 - an effective return

rate of 70%.

40. Louwerse explained that as long as "you were making money, we want to make

money" and that Farnam really does not want a buyout from Comtec.  Rather, it would prefer to

continue to receive the monthly rent payments.  Louwerse further stated "it's time for Farnam to

make money" off of Comtec.

**Farnam and Louwerse Misrepresented the Term "Equipment"**

40. Louwerse explained to Comtec early in the relationship that for leasing purposes

Comtec could use any schedule towards "non-equipment" or "service."

41. In the Lease Agreement, Section 1, the definition of Equipment is defined as

"hardware, non-hardware, and services" with no explanation of what Farnam considers services.

Because Farnam conveyed to Comtec initially and during the relationship that there was no

resale value, Farnam would provide us within funding for various types of costs such as

warrantees, labor, or subcontractors costs.

42. There was a higher interest rate for "non-equipment" or "services" well beyond a

reasonable market rate, but this was represented to Comtec by Louwerse as a bonus to Comtec

for using their leasing program.  Items with no residual value could be added to the initial Lease

Agreement, but paid back at a higher rate. For these items to qualify there were typically no

serial numbers. There was also no guidance, restrictions, or definitions of what could fall into this category.

43. Nonetheless, Farnam encouraged Comtec to finance anything and everything under the term "non-hardware" and "services" without any form of definition. Upon information and belief, the terms "non-hardware" and "services" were deliberately not defined in the Lease Agreement, otherwise any form of description under those categories would have clearly indicated there was no possible way there could be a fair market residual value for a buyout upon termination.

44. Farnam, through Louwerse, repeatedly encouraged Comtec to use a large percentage of each schedule towards these items. Upon information and belief, Farnam was attempting to increase the Comtec's liability under the Lease Agreement under the disguise that it was a favor or benefit to Comtec.

45. Comtec reasonably relied upon the representations of Farnam and Louwerse. However, if Comtec sought to terminate the Lease Agreement, it could not as it would have been impossible to return the non-hardware and services.

46. With exclusive authority to reject termination and extend the Lease Term indefinitely by determining that a single serial number under "hardware" part of the same Schedule did not match upon return, Farnam effectively locked Comtec into a Lease Agreement for services and non-equipment that would extend in perpetuity.

47. The inducement to use Farnam funds for goods and services that would be non-equipment and blend them into an equipment rental is nothing more than a financial trap to have large amount of zero-residual value-items trapped in an evergreen payment plan.

**Missing or Improper Serial Numbers and Missing Product as Grounds to Reject Termination**

48.     Farnam designed their entire agreement around funding as many part numbers as possible that are then delivered to a vast number of remote locations.  All the while knowing all that at the conclusion of the Schedule's term, if a single serial number or product was missing Farnam would reject the return and the Schedule's term would automatically renew for another year.

49.     This scam was done in such a way to confuse Comtec and manipulate information that Farnam controlled. Each and every certificate within a Schedule asked for the signor of Comtec to "agree and accept" and certify that the equipment was received and in good working order, however Comtec did not have access to the original equipment or any ability to verify the serial numbers.  Only Farnam could have done so. At no time was serial numbers reviewed or asked to be verified by Farnam.  Importantly, if any of the serial numbers are missing or are incorrect, then Comtec would be declared in default upon and any attempts to terminate the Lease Agreement would be rejected.

50.     For something so paramount to be missing from the signing of each Schedule shows an intent of Farnam to preclude Comtec employees from verifying the serial numbers. It was only at the conclusion of fulfilling the dollar amount of entire Schedule when Comtec was asked to sign off on the entirety of the Lease Schedule without access to any of the equipment or serial numbers.

51.     In the from Farnam demanded Comtec sign, all the equipment is listed however, some of the serial numbers were withheld by Farnam. Instead of disclosing the serial numbers and disclosing the importance of matching the serial numbers upon termination, Farnam chose to say softly that "serial numbers contained in previous certificates are part of the agreement."

11

52.     The serial numbers need to be checked and cross-verified at the time of shipment, not at the end of the Schedule's term as demanded by Farnam. The equipment was already deployed. This process utilized by Farnam was designed to mislead the final signer that somehow serial numbers were all verified by Farnam.

53.     In addition, the only serial numbers Comtec was asked to verify were serial numbers printed on invoices, not the serial numbers on the actual equipment.  Within each invoice, the supplier provided Farnam with anticipated serial numbers, yet no representative of Farnam ever compared the serial number on the products with the serial number on the invoices.

54.     Farnam represented to Comtec that the numbers were correct, without actual knowledge or verification to Comtec.  Farnam knew that if any serial numbers were incorrect on the invoice, transposed on their sign off, or substituted during shipment by the manufacturer, or simply just wrong, Farnam could reject termination and extend the Lease Agreement in perpetuity.

55.     This cleverly designed use of the words in section 7 of the Lease Agreement "return all equipment" combined with "exact serial numbers" was a scam as Farnam knew Comtec could never fully comply with Farnam's return policy.

56.     There were also many invoices that had hardware with no serial numbers whatsoever, making it impossible for Comtec to identify and return the proper equipment. See Schedule 4 Certificate #5). It is impossible to collect a product from a client for return to Farnam when Comtec cannot prove it was theirs. This would make Schedules 2-7 impossible to verify and fulfill.

57.     Comtec attempted to comply with the return policy for Schedule 1.  Upon the expiration of Schedule 1, Comtec had collected and prepared to send back the majority of the Lease in accordance with its terms.

58.     Comtec then realized that certain serial numbers that did not line up with a Schedule.  Comtec learned that Farnam shipped equipment that had no serial numbers. (Schedule 4 certificate 5 as an example).  Comtec reached out to Louwerse and asked about the policy for substituting lost stolen or unobtainable product and how to return actual hardware they shipped with no serial numbers.

59.     Comtec assumed it would have to pay the fair market residual value for this item. However, Farnam took the position that Comtec would be in default and there was no substituting a product that did not match the original serial numbers. Comtec's only option, according to Louwerse was to recast the entirety of the Schedule as "Non Hardware" items and services.

60.     Comtec was told that it was not allowed to replace hardware that was not on the original serialized orders regardless of the reason. Comtec only had two choices: (1) to continue the current lease whereas Louwerse advised would be "perpetual"; or (2) pay a buyout fee to be solely determined by Farnam and Louwerse. Louwerse specifically said Farnam could renegotiate the lease in another year and as long as Comtec could not find or produce the original scheduled serial numbers, the term for the Schedule would never end.  His reasoning was that "we are now business partners."

61.     This tactic leaves Farnam the ability to inflate the ongoing monthly leasing fee or inflate the fair market value buyout which are the only two options remaining at the end of the Schedule term. In fact, Louwerse told Comtec that it would deny the shipment in full if we

attempted to ship back product. In the Return Instructions, attached as **Exhibit F**, Farnam

reiterates the use of ALL and that they will reject shipment in entirety of a single serial number is

missing.

### Farnam Charged And Received Interim Rent Far In Excess Of What Was Provided In The Lease Agreement.

62.     The term "Interim rent" is not described or addressed in the Lease Agreement or

in any of the Schedules.  However, Farnam regularly charged and Comtec regularly paid

excessive "interim rent."

63.     The Lease Agreement states that "Commencement" in will begin upon installation

and combined with the equipment on the Schedule. The Schedule referred to in the Lease

Agreement was never discussed prior to the execution and delivery of the Lease Agreement.

During the installation process Comtec would request money through a Certificate, which also

makes reference to the Schedule, leading Comtec to understand that "commencement" of the

Schedule would start at the acceptance of the Certificate.

64.     Comtec reasonably relied on these statements and began making rent payments

upon the acceptance of the Certificates by Farnam.

65.     However, those payments were not treated as "rent payments" under the Lease

Agreement by Farnam.  Rather, Farnam would continue to accept more Certificates from Comtec

until Comtec had used up all of the proposed funding for that specific Schedule.  The final

Schedule would be prepared by Farnam and presented to Comtec for execution.

66.     For the first time, the term "Interim Rent" appears and states that all rent received

by Farnam after accepting the certificates, but before the final Schedule had been filled, would

not count towards the pay-off of the Schedule.  It was defined in the Schedule as "Interim Rent."

Interim rent was really just an interest rate assigned to payments that were outstanding between

the time of the Certificates and the time of the resulting Schedule which at times amounted to over 30% of the value of the Schedule.

67.    Had this been disclosed to Comtec, Comtec could have either required smaller Schedules up front so that we could full fill them timely or requested money at the end of a term in bulk once the full Schedule of money was needed. This was not transparent on the front end of the agreement and Comtec accounting personnel were misled by Farnam and Louwerse.

68.    In total, Comtec paid over $284,000 in Interim Rent to Farnam over the course of the seven (7) Schedules.

### Farnam Improperly Represented That No Late Charges Were Due, Only To Demand Late Charges If Comtec Requested A Buyout.

69.    Comtec was very clear throughout its relationship with Farnam that it wanted to understand all its liabilities and it regularly requested statements from Farnam. In each statement, there was no indication that any payments were late or that Farnam was charging a late fee.

70.    It was not until Comtec asked for a buyout of Schedule 2 that Farnam then updated three (3) years' worth of statements and added in over $1,600 worth of late charges to Schedule 2.

71.    When we questioned why Farnam would do this, Louwerse responded that "is what it is" and "I recommend you execute the agreement and wire payment ASAP before you accrue more cost."  "Also, please remember, if we haven't received payment and the equipment isn't returned by the 10th, the lease will continue in accordance to the master lease agreement (renew for 12 months)."

72.    When Comtec asked for the full buyout of all remaining Schedules Farnam sent Comtec an email and listed $12,671.82 in late charges. None of these charges were ever disclosed nor discussed during the three (3) year relationship with Farnam.

**COUNT ONE**
**New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.**
**All Defendants**

73.      Plaintiff, Comtec, repeats and realleges paragraphs one (1) through seventy-two (72) above as if fully set forth herein.

74.      Farnam is a "person" as defined by N.J.S.A. 56:8-1.

75.      Louwerse is a "person" as defined by N.J.S.A. 56:8-1.

76.      The offering of credit in the form of finance leases to Comtec constitutes "sale or advertisement" of merchandise as defined by N.J.S.A. 56:8-1.

77.      The acts of Farnam and Louwerse, as more fully described above, constitute the "act, use or employment by an person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of a material fact" prohibited by N.J.S.A. 56:8-2.

78.      Comtec reasonably relied on the representations and the knowing concealment, suppression, or omission of a material fact.

79.      As a result, Comtec has been damaged by the conduct of Farnam acting by and through Louwerse.

WHEREFORE, Plaintiff, Comtec, demands entry of a judgment against Farnam and Louwerse for any and all actual damages, disgorgement of any and all rent, including interim rent, payments, consequential, and expectation damages, trebled pursuant to N.J.S.A. 56:8-4, plus attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief the court deems equitable and just.

## COUNT TWO
## COMMON LAW FRAUD
### All Defendants

80.     Plaintiff, Comtec, repeats and realleges paragraphs one (1) through seventy-nine (79) above as if fully set forth herein.

81.     The statements made by Louwerse as detailed above made to induce Plaintiff into signing the Lease Agreement, Schedules, and Certificates, were knowingly false.

82.     At the time the statements were made about the fair market value, residual value, return or replacement of the equipment, or the ability of the Plaintiff to terminate the Lease Agreement upon 120 days written notice, were in fact false.

83.     Plaintiff reasonably relied on the statements when signing the Lease Agreement, Schedules, and Certificates.

84.     Plaintiff suffered a damages as a result of the conduct and false statements made by Louwerse.

WHEREFORE, Plaintiff, Comtec, demands entry of a judgment against Farnam and Louwerse for any and all actual damages, disgorgement of any and all rent, including interim rent, payments, consequential, and expectation damages, punitive damages, plus attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief the court deems equitable and just.

## COUNT THREE
## Civil Conspiracy
### All Defendants

85.     Plaintiff, Comtec, repeats and realleges paragraphs one (1) through eighty-four (84) above as if fully set forth herein.

17

86.     Defendants, Farnam, Louwerse, John Does 1-10, and Jane Does 1-10, worked in concert to commit the unconscionable commercial practices detailed above.

87.     Each member of the conspiracy acted in furtherance of the conspiracy at all relevant times to deprive the Plaintiff of assets and money.

88.     It was the common business practice of Farnam, Louwerse, and others to entrap small unsuspecting companies into perpetual "finance leases" while misleading the principals of those companies as to the consequences of the different terms of the purported leases.

89.     By misleading and misrepresenting their true motives, to entrap small unsuspecting companies into perpetual "finance leases," each defendant is jointly and severally liable for any and all damages caused by the conduct of the conspiracy members.

90.     Further, each member of the conspiracy acted in concert to design and implement purported "finance leases" that were impossible for a small unsuspecting company to comply, so as to declare the leasees in default or to automatically renew the lease payment obligations indefinitely.

91.     Plaintiff, Comtec, has been damaged by the conspiratorial acts of the Defendants.

WHEREFORE, Plaintiff, Comtec, demands entry of a judgment against Farnam and Louwerse for any and all actual damages, disgorgement of any and all rent, including interim rent, payments, consequential, and expectation damages, punitive damages, plus attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief the court deems equitable and just.

## <u>NOTICE OF DESIGNATION OF TRIAL COUNSEL</u>

Pursuant to <u>Rule</u> 4:25-4, William P. Rubley and Eric A. Browndorf with Cooper Levenson, PA are hereby designated as trial counsel for Plaintiff, Comtec Systems, Inc., for the above entitled matter.

## <u>CERTIFICATION PURSUANT TO RULE 4:5-1</u>

I hereby certify that the matter in controversy is the subject of another action pending in Federal District Court for the District of Minnesota, entitled <u>Farnam Street Financial, Inc. v. Comtec Systems, Inc.</u>, bearing case number Case No.:  21-cv-02074-JRT-BRT.  To the best of my knowledge and belief, no other party should be joined in this litigation.  Additionally, Plaintiff, recognizes its continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this certification.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff, Comtec Systems, Inc., hereby demands a trial by jury on all issues so triable.


Dated:  October 13, 2021

/s/ Eric A. Browndorf
Eric A. Browndorf, Esq. (002591983)

/s/ William P. Rubley
William P. Rubley, Esq. (019192002)
COOPER LEVENSON, P.A.
1415 Marlton Pike (Route 70) East
Cherry Hill Plaza – Suite 205
Cherry Hill, NJ 08034
Telephone: (856)795-9110
Facsimile: (856)795-8641
File No. 46641-00111
Attorneys for Comtec Systems, Inc.